ROGERS (MOFFITT v.). See Case No. 9,691.

## Case No. 12,018.

### ROGERS et al. v. PARKER.

[1 Hughes, 148.] [1]

Circuit Court, E. D. Virginia. Jan., 1877.

ATTORNEY AND CLIENT — JUDGMENT OBTAINED THROUGH NEGLECT OF COUNSEL—BILL TO RESTRAIN.

·Where a judgment at law had been rendered against a defendant, who had entered his appearance, through the inattention and neglect of his counsel, and the counsel was not pecuniarily responsible for the amount of the judgment, on a bill brought by this defendant to restrain all proceedings to collect the judgment. Held, on demurrer, that the bill must be dismissed.

Bill in equity [by William B. Rogers and others against David B. Parker, United States marshal].

The bill alleges the following series of facts: Jesse J. Simpkins was appointed United States collector at the port of Norfolk, Virginia, and the complainants became his sureties for the sum of $50,000, prior to the war. On the breaking out of the war Simpkins was indebted to the United States in the sum of $11,000 and upwards. He had in his hands, including that amount, in all $16,489.80, of which $10,000 was in gold belonging to the United States. At the commencement of hostilities he was ready and willing to pay to the United States the amount then in his hands, and used every possible exertion for that purpose. Owing to the occupation of Norfolk by the Confederate military forces, he was unable either to send the money to the United States or to keep it safely, and with a view to its greater security deposited the same secretly at night in the vaults of a bank at Norfolk. The money subsequently becoming more insecure there, and feeling that he might be liable for moving the money contrary to law from the vaults in the custom-house office, it was secretly returned to the vaults again. Major General Huger having at his command, present, an active and ample military force, demanded the money from Simpkins as an officer of the Confederate authorities. Being unable to resist that demand, and hoping to secure the money to the United States, a con-

ference was held between Simpkins, the sureties on his bond, and the United States district attorney, and by the advice of that attorney it was arranged that the money should be placed as a special deposit in the treasury of the state of Virginia, under·the belief that it would thus be secured to the United States, in the event of the failure of the Confederate arms. General Huger consenting thereto, the money was so placed as a special deposit, and no part of the same has ever been removed, but is now there, as the complainants insist, the property and subject to the order of the United States. Under these circumstances a suit at law was commenced by the United States in the circuit court of the United States for the district of Virginia, against the complainants in this suit, on said bond, Simpkins in the meantime having died insolvent. The complainants employed counsel to defend said suit, and to appear and cause their names to be entered upon the docket, and upon whom the complainant relied to plead and make the defence to the said suit at law. Upon the trial the said counsel, although regular practitioners at that bar, were not present, and the complainants did not know of the said trial, nor that a judgment was rendered in said cause, until long after the said judgment had become final and absolute.

In June, 1872 [17 Stat. 674], an act of congress was passed for the relief of Simpkins's sureties, authorizing the attorney-general to demand and receive from the state of Virginia the amount so deposited, and the attorney-general was also authorized to stay proceedings on the said judgments until it was ascertained whether Virginia would make payments of said deposit. Subsequently, and on April 3d, 1873, the agent of the attorney-general demanded such payment of the state of Virginia, but the demand was refused on the ground that such payment was forbidden by the constitution of the state. On the 29th of April, 1873, the complainants, as required by the said act, delivered to David B. Parker a forthcoming bond, in the sum of $20,180, to satisfy the amount of the said judgment of $11,795, with costs and interest. The only consideration for the said forthcoming bond was the said judgment against them as Simpkins's sureties. No part of the money which that judgment represented was lost, or squandered, or embezzled by Simpkins. No part of that fund has ever come into the possession of either of the persons against whom the judgment runs. They are chargeable with no fault or neglect, and have in no way contributed to produce either the loss or peril in which the money is placed. The judgment was not only recovered against them without any fault or neglect on their part, but neither one nor all of the attorneys or counsel so employed by them, and relied upon to make their defence, are able to pay the amount of the judgment or to indemnify the complainants against the same, where-

fore they pray a perpetual injunction against the said party from attempting to enforce the said forthcoming bond. All parties are citizens of Virginia.

The bill was brought against D. B. Parker, as marshal of the United States for the Eastern district of Virginia. After it was commenced Parker resigned, and C. P. Ramsdell, his successor, was made, by order of court, defendant in his place. To the bill the defendant, C. P. Ramsdell, interposed a general demurrer, and made affidavit to it in usual form.

The defendant's statement of his grounds of demurrer, submitted by L. L. Lewis, U. S. Atty., were as follows:

1st. Because, as shown on the face of the bill, the complainants had their day on the law side of this court; that judgment in the matter was rendered against them, fairly and bona fide, and that if any wrong has been done said complainants, it arises from their own fault and neglect, as shown by their said bill itself.

2d. Because the defence set up in said bill is neither at law nor in equity a sufficient answer to the demands of the United States against them and their principal, the late Jesse J. Simpkins.

3d. Because, even admitting the defence as set up in said bill to be sufficient (which this defendant does not), it does not appear from the statements contained in said bill that the complainants did not have ample opportunity to have applied to the court wherein said judgment was rendered, to set aside the verdict, and to grant them a new trial.

H. H. Wells, for complainants, insisted in argument:

The application for injunction in this case does not depend upon the citizenship of the parties, but upon the fact that the proceeding is in the same court in which the judgment was rendered, and is ancillary to the original suit. Dunn v. Clark, 8 Pet. [33 U. S.] 1; Christmas v. Russell, 14 Wall. [81 U. S.] 69 (as to what is ancillary); Jones v. Andrews, 10 Wall. [77 U. S.] 327; Dunlap v. Stetson [Case No. 4,164]; Freeman v. Howe, 24 How. [65 U. S.] 450; Clark v. Matthews, 12 Pet. [37 U. S.] 170; (see brief in Fant v. Stewart [unreported], in this court): St. Luke's Hospital v. Barclay [Case No. 12,241]. The general rule is that equity will enjoin judgments which are against good conscience, and which can be impeached by facts or grounds which the party could not avail himself of at law, or of which he was prevented from availing himself by fraud, accident, or mistake, without any negligence or fraud on his part. Hil. Inj. (Ed. 1865) p. 154; Marine Ins. Co. of Alexandria v. Hodgson, 7 Cranch [11 U. S.] 332; Daniell, Ch. Prac. p. 1725, and cases there cited; Holland v. Trotter, 22 Grat. 136, 141–144 (a very strong case).

No judgment could be more inequitable than the judgment in this case. The sureties were held liable upon a cause of action for which the principal, if living, would not have been liable for money taken from him by a military force of the Confederate States. The bill sets these facts out fully, and in Thompson's Case, 15 Wall. [82 U. S.] 337, the court decided, not only that the Confederate States were public enemies, but that a collector or receiver of public money, under bonds to keep it safely and to pay it when required, is not bound to render the money at all events, but is excused if prevented from rendering it by the act of God or a public enemy without any neglect or fraud on his part.

Up to this point there probably would be no dispute or discussion. The real question of difficulty, greater or less, is whether the complainants have lost their right to equitable relief by fault or negligence, and the only possible fault or negligence to be imputed to them is that they did not present that defence at the trial on the common law side of the court. They did, however, and the bill so avers, employ counsel in good and regular standing to defend the suit, who caused their names to be entered on the docket, but they were not present at the trial, and neither they nor the defendants in that suit knew of the trial until the end of the term at which it was had. The bill further avers, and it is true, that the counsel were not pecuniarily responsible, and are unable to pay the amount of the judgment or to indemnify the complainants in this case. In this condition of the case we maintain that all imputable laches are explained and excused, and that the complainants are entitled to the same relief, founded upon the facts alleged, that they would have been entitled to if these fact had been well pleaded and established on the trial, or had not been discussed until after the trial. See Mosby v. Haskins, 4 Hen. & M. 427. The bill was for injunction to relieve against a judgment under these circumstances. The complainant had no knowledge of the suit at law until after the judgment was obtained. He presumed when the writ was served upon him that it was in a chancery suit, brought to subject the estate of his ward. Injunction granted. In Marine Ins. Co. of Alexandria v. Hodgson, cited above, the court say: "A court of chancery being capable of imposing its own terms upon a party to whom it grants relief, there may be cases in which its relief ought to be granted to a person who might have defended, but omitted to defend himself at law." In Smyth v. Balch, 40 N. H. 363, where an attorney brought a suit without any authority for the plaintiff, and the defendant obtained a judgment for costs, it was held "a court of equity will restrain the enforcing of such a judgment by a perpetual injunction, if it be shown that the counsel is poor and unable to respond." The language of the court in that case was: "The want of authority and ability being established, we are of opinion that

the plaintiffs are entitled to relief upon the authority of numerous cases. A perpetual injunction should therefore issue." When, by the neglect of an attorney of good reputation, a party has been defaulted, the court will enjoin the judgment, if, on discovering the default, he applies for redress. In such case he is not guilty of laches, and certainly he will be relieved when the attorney is insolvent. Huebschman v. Baker, 7 Wis. 542, cited in Hil. Inj. 177; Denton v. Noyes, 6 Johns. 300. Where a judgment has been obtained by default through mistake, without laches, and manifest injustice will be done, a suit in equity to set it aside can be maintained after the expiration of the term whereby the right to open the judgment by motion was lost. This is a strong case. Mr. Justice Field united in the judgment. Bibend v. Kreutz, 20 Cal. 109. If an attorney appears for a defendant, even without authority, and a judgment passes against him, it will not be enjoined, unless it is shown that the attorney is not of sufficient ability to answer the demand. Bunton v. Ingford, 37 N. H. 512.

HUGHES, District Judge. Jesse J. Simpkins, at the outbreak of the war, was collector of customs at the port of Norfolk. The complainants were sureties on his official bond. In the month of January, 1871, the United States obtained a judgment in this court on the bond for $11,795.58, which has never been satisfied. The bill prays for an injunction to restrain all proceedings under the said judgment to collect it, and the prayer of the bill is based on two grounds: 1. That said judgment was rendered in the absence of the complainants and of their counsel, who had been employed to defend the action, and who had entered an appearance in the action, and that its rendition did not come to the knowledge of the complainants or to their counsel until the same had become absolute. That the counsel thus employed is insolvent, and unable to respond in damages should a judgment be obtained by complainants against him for his neglect of duty in not defending said action.

There is no more fully settled principle of equity jurisprudence than that a party who has had "his day in court," and against whom judgment has been rendered at law, is not entitled to the interference of a court of equity by granting an injunction to the judgment, unless it be clearly shown that it would be inequitable and "against good conscience" to enforce said judgment, and that the same was rendered without default or negligence on the part of the defendants or their agents. No case can be cited where the contrary has been held, while in favor of the proposition as laid down, a long train of decisions of the highest courts in this country and in England can be adduced. "It is to the interest of the republic that there be an end of suits." Parties, therefore, will not be allowed to relitigate in a court of equity matters passed upon by a court of law, and to which opportunity was afforded to appear and make defence. If it were otherwise, there would literally be no end of litigation, and litigious persons would be encouraged to neglect their causes at law, by an assurance that a ready ear would be lent by courts of equity to their applications to reopen the controversy. This would not only be against public policy, as tending to prolong, instead of ending, litigation, but would work manifest injustice to those suitors whose causes, not yet litigated, are awaiting hearing.

It is unnecessary, however, to enlarge upon a principle so very often expressed by the ablest judges this country has produced. The leading case upon the subject in this country is the case of Marine Ins. Co. of Alexandria v. Hodgson, 7 Cranch [11 U. S.] 333. In that case Chief Justice Marshall, in delivering the opinion of the court, says (page 336): "It may safely be said that any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery. On the other hand, it may with equal certainty be laid down as a general rule that a defence cannot be set up in equity which has been fully and fairly set up at law, although it may be the opinion of that court that the defence ought to have been sustained at law." In this case the complainants sought relief "from a judgment, on account of a defence which, if good anywhere, was good at law, and which they were not prevented by the act of the defendants, or by any pure and unmixed accident, from making at law." Pages 336, 337. See, also, Foster v. Wood, 6 Johns. Ch. 89. In the case of Truly v. Wanzer, 5 How. [46 U. S.] 142, the complainants prayed a perpetual injunction to a judgment at law, on the ground that the contract upon which the judgment was rendered was illegal. But the supreme court said: "Even if the alleged illegality of the contract would have constituted an available defence to the payment of the note, it would be a strange abuse of the functions of a court of equity to grant an injunction against enforcing a judgment at law because a purchaser, with a full knowledge of his defence, had omitted to urge it." Page 142. In the case of Creath's Adm'r v. Sims, 5 How. [46 U. S.] 356, the complainants prayed an injunction to a judgment at law, on the ground, among others, that the contract upon which judgment was obtained was illegal, and that "the judgment was in fraud of the defendant's rights." In the course of the opinion of the supreme court, the following language is used: "Whenever a competent remedy or defence shall have existed at

law, the party who may have neglected to use it will never be permitted here (in a court of equity) to supply the omission, to the encouragement of useless and expensive litigation, and perhaps to the subversion of justice." It has been held in Arkansas that "a judgment at law will not be enjoined merely on account of the negligence, unaccompanied by fraudulent combination or connivance, of the defendant's attorney." Wynn v. Wilson [Case No. 18,116]. The law upon the subject has been very clearly laid down in a number of cases by the Virginia court of appeals, and especially in two recent decisions by that court. In the case of Richmond Enquirer Co. v. Robinson, 24 Grat. 548, it is held that "equity will only relieve against a judgment at law, if the omission of the defendant to avail himself of his defence at law was unmixed with any negligence in himself or his agents." In the same case, at page 552, the court says: "This rule is absolutely inflexible, and cannot be violated, even when the judgment is manifestly wrong in law or fact, or when the effect of allowing it to stand will be to compel the payment of a debt which the defendant does not owe, or which he owes to a third person." In the case of Wallace v. Richmond,—a case like this,—in which relief from a judgment at law was prayed for, on the ground of the negligence of defendant's attorney in not pleading and making defence at law, and in which the facts seem to be stronger in favor of complainant than in the case at bar, the Virginia court of appeals refused to grant the relief prayed for, and affirmed the decree of the court below dismissing the bill. 26 Grat. 67. See all the authorities upon the subject referred to and commented upon in 2 White & T. Lead. Cas. Eq. 1335, etc. "A party cannot have relief in equity because he has lost the benefit of a good defence in consequence of the ignorance, mistake, or negligence of his attorney, however clearly it may appear that a cause was sacrificed which might have been successfully defended." Id., and cases there cited. From these authorities it will appear that the mere fact of the insolvency of the agent by whose neglect the judgment at law complained of was rendered will not suffice to give jurisdiction to a court of equity to grant an injunction. And the reason is obvious. Parties can select whom they please as counsel. If they, therefore, choose to retain a negligent attorney, who is at the same time insolvent and unable to respond in damages for his neglect, they have no one but themselves to blame for their choice and its consequences. The case of Holland v. Trotter, 22 Grat. 136, is not an authority in this case. There the defendant at law was prevented from employing counsel and making defence to the action in consequence of the promises and representations made to him by the plaintiff's attorney, who induced him to believe that the plaintiff would abandon the suit, and that it would therefore be unnecessary for him (the defendant) to make defence or trouble himself further about the matter. Notwithstanding, judgment was afterwards, without notice or retraction of these promises, rendered against him. To have held otherwise, would have been a shock to all sense of propriety and fair dealing. It would have been judicially declaring the plaintiff entitled to the fruits of his fraud upon an innocent party. Such is not this case. The bill contains no allegation of imposition or fraud practiced upon the complainants by the attorney of the United States who obtained the judgment, and who now, as attorney for the complainants, seeks to have it perpetually enjoined. See also the decisions in Scott v. Hore [Case No. 12,535], and in Re Ferguson [Id. 4,738], reported elsewhere in this volume.

2. As to the second ground upon which relief is prayed for in this case. It is alleged in the bill that the commander of the Confederate forces at Norfolk, in 1861, demanded of the collector the moneys of the United States in his hands, and that there was at hand an ample force to compel obedience to the demand. Nevertheless no attempt to use force was made, or even threatened, to compel the payment of the money, and the collector himself did substantially what General Huger required, viz., surrendered the fund to a hostile government at war with the United States, to wit, the de facto state government at Richmond. It thus appears that no steps were taken to enforce the demand of General Huger, and that, therefore, the question of "forcible seizure" does not arise in this case, as in the case of U. S. v. Thomas, 15 Wall. [82 U. S.] 341, upon which the complainants' counsel relies. Moreover, in the case just referred to stress is laid by the court on the fact that Thomas, the surveyor of customs at Nashville, and the principal defendant, was shown to have been loyal, and not one of the insurrectionists willingly co-operating with the public enemies. No such allegation is made with respect to Simpkins, and the presumption is the other way. This case, therefore, comes strictly within the rule laid down by the supreme court in the case of U. S. v. Keiler, 9 Wall. [76 U. S.] 87, and the demurrer to the bill must be sustained.